Our second case is 25-1012 Retail Energy vs. Advancement League vs. Brown. Mr. Johnson, whenever you're ready. Thank you, Your Honor. May it please the Court. Tom Johnson, appearing for the Retail Energy Advancement League and Green Mountain Energy Company. The State of Maryland has enacted a law that prohibits my clients from making any claims about the environmental benefits of their products, including by calling them green, clean, renewable, environmentally friendly, and, quote, similar claims, among others. My clients accurately use these terms to describe the renewable energy certificates, or RECs, that they sell to consumers. And the Federal Trade Commission has blessed RECs as the way that companies substantiate renewable energy claims. In Senate Bill 1, however, Maryland prohibits companies from marketing RECs consistent with federal law unless they are Maryland's preferred RECs. That is, unless they are RECs that further, quote, Maryland's interest in promoting the development of regional renewable energy sources. Is that in the statute? Is that the purpose of the statute? Your Honor, they are telling you in their brief that that is one of the substantial state interests. In fact, it's the only substantial state interest that they argue in their brief supports the particular limitation in the statute, which is that you can only market RECs if they come from the 13-state region known as the PJM. Now, go ahead. And the reason that they give for that, Your Honor, is because they believe that those RECs have environmental benefits for Marylanders. They argue that there are benefits to having RECs that are local, as they're characterizing local, even though it's a far-flung geographic area. And the point, Your Honor, is whatever Maryland, whatever interest Maryland might have in deciding what its renewable portfolio standard is, we're not arguing that they may not have legitimate ways of furthering those interests. What they can't do is restrict speech. What they have done — Well, sorry to interrupt you there, but I thought your first argument was that that wasn't the interest that was presented to the district court below. That's correct, Your Honor. I mean, I think that they've also waived it, and I think the court could consider that waived. Well, the reason I'm asking, and I think you're about to make this point, is it would seem to me that that would be a legitimate interest that any state would want to promote, that is, the health and environment of the state and the health of their citizens. But you say they can't do it in this way, even if they had preserved the argument? That's correct, Your Honor. So I think this is like what the Supreme Court said in Sorrell. So let's assume for the moment, Your Honor, that we're talking about this under intermediate scrutiny. I mean, we have arguments that strict scrutiny should apply. But whether you have a substantial state interest is only the first prong of that analysis. So certainly caring about the health and welfare of your citizens, I mean, that can be a substantial state interest. But then the question is, what means do you use to advance that interest? And so, for example, in Sorrell, Your Honor, the Supreme Court said that what you cannot do, absent evidence of consumer deception, and again, there's a separate consumer deception argument in this case, but with respect to this particular mix of recs, what the state is telling you is that they want to promote their green energy claims, their environmental goals, by preventing my clients from talking about different types of benefits of their products. And what the Supreme Court in Sorrell is saying is that you can't limit speech as a means of promoting your interest in what you think is the good of your citizens. There may be other ways that you can do that, but you can't limit speech on an important question of public debate. Well, that issue of promoting regional renewable energy, even if they waived that second state interest argument, we're here on a preliminary injunction. Can't they raise that before the district court after we decide the preliminary injunction? They may be able to, Your Honor. But, I mean, for purposes of this relief. Assume they can. Wouldn't that make it more likely that they might prevail on the merits? I don't think that interest helps them, Your Honor, because, again, the question is, have they chosen a means here that is permissible to advance that substantial state interest? And what they have done, Your Honor, here is they have prevented my clients from marketing the renewable benefits of their products. So my clients believe, my clients cannot currently say that the RECs that they have been marketing and selling to consumers in Maryland are green because they're backed by wind or solar power, that they're green because of their emissions profile, because they reduce carbon dioxide emissions, and because that helps to offset climate change, because it reduces particulate matter in the air. These are all things that are true. They're true, accurate claims. That's why the FTC has said. So let me make sure I understand what's going on here. So you're saying that your clients are still able to sell energy in the state, but they are not able to represent what that energy means. Yes. So I would clarify that in this way, Your Honor. There's two markets that are created by this statute. So one is the green power market, and in order to enter the green power market, you have to comply with these speech restrictions, right? So the prohibition on speech. There's also a disclosure requirement in the statute. And then you need to go through an administrative process to get the price of your green power product approved by the commission. Now, if you don't want to go through that process, Your Honor, you can participate in the regular power market. But in the regular power market, you're price capped, and the only thing that my clients would have to distinguish their products in that market from the incumbent utilities product is speech. It's to advertise to eco-conscious and eco-friendly customers that you ought to switch to our products because they're more environmentally friendly. This statute prohibits them from doing that. You said a basic level. Before SB1 was enacted, companies were calling the product clean and green, even though you were supplying non-renewable energy into the grid. How is that not misleading? So, Your Honor, I don't think it's the case, at least with respect to my clients, that they were doing that. You know, my clients sell 100% renewable products. The only difference here between these products and the ones that Maryland is permitting people to market is that some of the wind and solar power is sourced outside of Maryland's preferred region. And our clients say that there's benefits to that that consumers like, the ability to offset global climate change, which doesn't know, you know, there's one atmosphere. It's not a distinction between, you know, Maryland or Texas or North Dakota in that regard. Even though that is what your clients are selling, what ultimately reaches the consumer? Because I think that was the source of the what is misleading. Yeah, so that's critical, Your Honor, right? So if we look at the consumer deception rationale, what the evidence shows in the argument that they're bringing to this court is they have a couple of anecdotes from consumers who are saying Who is more than a couple? Well, there was two affidavits from consumers, Your Honor. And then they had a report from a nonprofit coalition. But that did not have any additional consumer anecdotes in them. So the two affidavits that I'm familiar with, Your Honor, and the ones that they are citing in their brief, these consumers are saying, we thought that what it meant to purchase renewable energy is that our house was physically connected to a wind farm, right? That we thought we were getting energy directly from a renewable resource. The problem is that if that was the problem, Your Honor, then perhaps additional tailored disclosures about Rex might be appropriate to alleviate that confusion. That might be a more tailored response to that. But what they did instead, Your Honor, was to create a line where they're still permitting the marketing of Rex. The Maryland portfolio standard that they are trumpeting, that is still based on unbundled Rex. It's still power that is not going directly to a consumer's home from a renewable resource. And yet they're here telling you that these terms, green, clean, renewable, et cetera, are inherently misleading because consumers inherently believe that what that means is you're connected to wind power. Could the state just simply bar your clients entirely from engaging in the market in order to promote their local interests? If that happened, Your Honor, we wouldn't have a First Amendment argument for sure. I mean, we might have other arguments. There's a dormant Commerce Clause claim preserved in the district court. But it's the same in Sorrell, Your Honor. The state there, Vermont, was going after prescriber practices that it believed were detrimental to patients. And perhaps they could have prescribed some of those prescriber practices. Simply because the state might be able permissibly to limit entry into a market or to prohibit you from entry into a market doesn't mean that they can restrict speech. That's the whole point of this multi-pronged test, Your Honor, right, under Central Hudson. Just because you have a substantial state interest doesn't then mean you can restrict, you know, truthful, accurate information about products. Can I ask you about the Second Circuit's decision in ALCO? I know it's not dispositive in any event, but does that resolve the case adversely to your client? Sorry, could you remind me of the ALCO case? Well, it was a dormant Commerce Clause argument involving Connecticut and Northeastern states, which seemed to align pretty well to the facts of this case. And the court there found no problem with the regulatory restrictions that were imposed in that case. And they might not have been speech related. I'm trying to remember if they were. But you tell me. That's right, Your Honor. So, again, I don't think that's before the court, because that was a dormant Commerce Clause argument. We're here, obviously, on a preliminary injunction on a First Amendment argument. I do think that mere protectionism is not a legitimate state interest. And so I do think we can draw that kind of – I mean, we would disagree with that decision. I mean, there's a Sixth Circuit decision involving utilities and recs that came out the underway, found a dormant Commerce Clause violation. But, again, I don't think that's really important for purposes of this discussion. Because, again, Your Honor, I mean, I can concede – Did you raise it in your reply brief, the dormant Commerce Clause? No, Your Honor, we would not have done that. If we mentioned it, we might have. But I don't recall. But that's not – we had two claims before the district court, dormant Commerce and First Amendment. Our preliminary injunction motion is solely on a First Amendment argument. If we raise it, Your Honor, it might have been to note you have a seven-state amicus brief in front of you, and they make the point that at some level protectionism, mere protectionism, is not sufficient for a substantial government interest. But let's assume you don't. I might be off the wall about this. I mean, this is all kind of a fiction anyway. I mean, you can't put clean energy into a grid at point A and get that same energy at point B. I mean, the grid takes all the energy that comes in. So what it is is a feel-good thing. If you get more than 51 percent, it's clean energy. Everybody feels good about it. And that's a fiction. But on the other hand, why shouldn't the state of Maryland be able to require you and other utilities to meet that requirement about clean and green energy to satisfy that fiction, to make the consumers feel good, you know, like recycling. We don't know where recycling goes, but everybody feels good about it. You pick it up and take it, they say, to a recycling place. So why isn't this a legitimate goal of the state of Maryland? Sure. So, I mean, a couple of responses to that. Judge Fletcher, I think this goes to your question too, Judge Giles, about how the grid works, right? So, Your Honor, absolutely they might have legitimate means to help, you know, make people feel good about their purchases, to advance their interests. But, again, what they have done here, I mean, you're absolutely right. The way that the grid works, it's impossible to know whether the energy from a particular renewable resource is reaching somebody's home, right? And so what they have done is they have taken a 12-plus state unit in which they are currently permitting people to market their products as green if they're starting from renewable resources as far away as Chicago. But you can't market your products as green if you're drawing from resources in New York, Connecticut, parts of Virginia, places that are much closer to Maryland. And even if you had a renewable resource down the street, it's not a given that that energy is going to reach your house, just based on the physics of how electricity works. And my point, Your Honor, is not, again, that I need to persuade you about kind of the kind of grapple with the physics of the grid. The point is that the means they have chosen here is to cut off marketing. It prevents my clients from making claims about why they believe that their renewable resources are better for consumers. So can I ask you, with respect to that, could the state of Maryland have said, instead of the limitations that they've imposed here, with respect to speech, have indicated, well, the statute is going to require those favored states, the ones that you identified within that grid, to be preferred by the state of Maryland. And your clients can market your products as green, but they also have to say that they don't fall within the preferred region that the state has demarcated as the ones that they've identified. Would that be okay? I think if the statute did not muzzle us in that way, Your Honor, but simply included a factual disclaimer along the lines of, and this already happens with respect to what was the preexisting renewable portfolio standard. You need to make accurate disclosures about the source of your RECs, and then you can market the products however you like. I don't think we would be standing here. But that's not what they did, and that's precisely the tailoring analysis that is required, whether you're talking about strict scrutiny or central Hudson. Here they cut off speech about every word that could relate to making an environmental claim about your product. So it's not, it's neither tailored to the evidence that, it doesn't directly advance their interest, because they're already permitting a lot of other speech about RECs, and it's not tailored precisely because they didn't consider the alternative you just suggested, Judge Diaz, which would have been factual disclosure. I have one final question, and then my colleagues might have some others. So this case proceeded at the district court, I think, on a contention, on a facial challenge, as I understand it. And now you're making it what appears to be an as-applied challenge on appeal. What are we to make of that? Does it matter? Your Honor, I don't think it matters. So first of all, I mean, if, I mean, the Supreme Court has said that with respect to the facial challenge, where the challenge is categorical, where it applies the same in all cases, then there's really no need to consider whether it's facial or as-applied. I mean, so here, Your Honor, anyone who is similarly situated to my clients, who are selling out-of-region RECs, who want to make green marketing claims with respect to those RECs, they are categorically prohibited from doing so. So the statute, and I don't need to show every application, right? On a First Amendment facial challenge, it's just a substantial number of applications, or it's, you know, in relation to the sweep of the statute. Now, we have demonstrated with respect to our clients that the statute is unconstitutional. We put declarations in the record. We have established, obviously, their standing. We've established that as-applied to them, the statute is unconstitutional because it applies to their products. They've cut off their marketing. They've, in many cases, exited the market. So I think that the court could, I mean, the point with raising that in the brief, Your Honor, I mean, it's the court's discretion, I think, to fashion the remedy. It could limit the remedy to our clients, but we do think that we've established a facial challenge. And what would be the remedy in your mind? Well, on the… And I lied. I had another question. Yeah, no, that's fine, Your Honor. I mean, in this posture, it would be to reverse and to grant the preliminary injunction and allow proceedings to continue in the district court. Thank you very much. Mr. Hanley. Good morning, Your Honor. Good morning. Good morning. May it please the court. Appellants are asking this court for an extraordinary relief of a preliminary injunction to allow them to continue to mislead Maryland consumers about the energy products that they and other third-party retail sellers provide. Prior to the adoption of SB1, retail energy suppliers operated a dysfunctional market in Maryland, advertising their products as 100% wind, 100% solar, 100% emission-free, and otherwise green and clean energy, with no standards by which consumers could measure these alleged green offers. In that time, Maryland consumers paid significantly higher rates for that energy. Despite this, many Maryland consumers would later discover the actual energy they received was no different than had they stayed with their standard utility. Instead, the only difference for consumers paying the significant higher rates were the inclusion of out-of-state renewable energy credits, or RECs, offered by retail energy suppliers that were paired with otherwise nondistinguishable standard energy. Now enacted, SB1 prevents appellants and similar retailers from using confusing and amorphous buzzwords such as green or clean to trick consumers into believing they're receiving renewable energy from the grid. So why, it sounds like certain producers of energy are prohibited from using those terms while others are. And on what basis is the State of Maryland making that distinction? Your Honor, the retail energy suppliers who are utilizing these claims that they are 100 percent green, 100 percent clean, and utilizing out-of-state RECs are unable to market in that specific terminology unless they meet the new green energy definition as laid out in SB1. And the definition is what? The definition? It's a geographic definition, right? It is, Your Honor. So how does that ameliorate confusion? They say their energy is every bit as green as the energy being produced by those producers in that region. Do you have any reason to dispute that? Your Honor, I'd say two things. First, RECs in Maryland are not RECs in Texas, are not RECs in California. RECs are state property law. The Alco case mentions this as well. And so a REC is not a one-for-one across the country, a one-for-one swap. So Maryland currently has no ability to determine what if any, what the renewable energy credit, what renewable energy is tied to that renewable energy credit in a different state. Versus in Maryland and in the PJM, they would have a better understanding of that. Maryland specifically obviously sets its own standards about what is renewable under the RPS which were mentioned before. And it's... What about the others in the region? Can you tell with respect to those? I don't know, Your Honor. However... Doesn't that undermine then the claim in terms of what is green energy then? Well, it's a combination of things, Your Honor. It's... The misleading nature of these claims at the forefront is the fact that salespeople would go to people's homes. This is all just retail, residential energy. They would go to people's homes. They would say, do you want to buy 100% non-emission energy? And this was the, this is the catalyst behind getting them to sign up for this. What's not... If the company simply said, we are going to be providing wind energy recs from Texas, SB1 doesn't stop that from happening. They could still market their products truthfully under SB1 by saying, we can provide you with 100% renewable energy credits based on wind power. But that's not what the statute does. I mean, it doesn't say you can only market green energy if you tell the consumer that it comes from State X. It says you can't market your product as green energy, period, because it comes from State X, even if it satisfies the requirements of the green energy definition that the State itself imposes. That's correct, Your Honor, that it does specifically mention, you know, specific words and amorphous terms that now have a definition. They're either required to meet 51% of the renewable energy output or recs in the PJM, or 1% above the RPS standards. And I think the ALCO case is a really important one to sort of demonstrate both the complexity of recs to the consumer in the first place, but also to emphasize the fact that this regional dimension, the fact that a rec out in Chicago may be part of the PJM, that's entirely the federal government's purview to create this regional grid setup. Maryland has nothing to do with that in terms of, you know, determining. That was FERC, as we put in our brief, that set this region up in the first place. So that there's this potential outlier of wind all the way in Chicago that doesn't. I agree that the concept of recs is confusing. I even struggled with it myself as I was reading it. But how does this law address that? Yes, Your Honor. I think it addresses it in two ways. It's the combination of the green power definition, which will give consumers the understanding that at least 50% of the energy that they received are local recs in the PJM. But that's also tied with the disclosures that are now a part of SB1. This is where the recs were sourced, from what energy they were sourced by, and what state they came from. All this in its totality, you know, gives these consumers a much better picture of what product they're buying, what product they're going to pay more for in the green power marketplace. And before, it was frankly the Wild West with some of these dysfunctional pieces. And SB1 obviously is, there are many different consumer protection pieces to this. We're obviously talking just about the green power definition and this disclosure requirement. But, you know, the ending of variable rate contracts, the requirement for salespeople to be registered, and the end of commission-based sales. So there's more here than just the green power definition and the disclosures. So can you address this question of exactly what argument was made to the district court below? You seem to have switched forces on appeal and moved toward an argument, or maybe you're making both, that part of the purpose of this statute is in addition to remedying consumer deception concerns, that there's also a purpose of promoting green energy for the benefit of Marylanders in the local area. And to me, that sounds entirely legitimate, but it didn't sound like, that didn't seem to be the argument that you made to the district court. Do I have that right? I think mostly right, Your Honor, in that we are making both these arguments, because I think it's important to recognize that the state of Maryland, since at least 2004, has had this substantial interest of trying to increase renewable energy creation in the state of Maryland itself. We did mention this at oral argument during the motion for the preliminary injunction. So I do believe it was preserved below. We did mention both the importance of RPS standards to the state in general, and also this idea that this bill assists in promoting green energy options here in Maryland and the PJM, and similar health benefits if renewable energy resources were increased as a percentage versus more dirty energy resources. Well, assuming that's preserved and that's an open question, but why isn't the better fit, and maybe that's not required, but why isn't the better fit as a matter of statute to say explicitly that anybody who is interested in marketing green energy in our state has to disclose whether or not that energy is coming from the region that's been identified by Maryland and is consistent with promoting its environmental and other social goals or not? And if you're not within that preferred region, you have to say so, but you still get to market your energy as being green if you can accurately represent that to be true. Why isn't that the better fit here? I think that's not the better fit, Your Honor, because RECs, again, in Maryland versus, say, Texas or Oklahoma or elsewhere are not necessarily a one-for-one equivalent. There are RECs are a creation of state property law. What a state determines is renewable versus a different state are different. So I think it's important that Maryland makes this distinction, and at the forefront, this is an attempt to stop misleading claims that were causing individuals to sign up for these offers based on the mistaken idea that they were going to get actual wind energy. And I think, as pointed out before, this was the General Assembly heard. But aren't you, on the other hand, compelling an outside energy producer to make a statement that's literally not true, that even though they might well be producing 100 percent renewable energy of some kind, whether it be wind, turbine, water, whatever, that they're not being compelled to say that it's not? No, Your Honor, I don't think that's right, because these energy providers are not creating the energy. They are purchasing the energy to then go into the Maryland grid. And so what they're doing is a Texas REC has no way to get to Maryland in the PJM, whereas RECs create it. The renewable energy that is paired with the RECs in the PJM are actually part of the Maryland grid and would provide actual renewable energy to the Maryland and PJM region in a way that if these companies are simply buying RECs out in Texas, they're not actually producing green energy. They're just simply providing the RECs, which concededly are the way in which you are able to do an accounting. As mentioned before, when you turn on a light, you don't have some indication. So they aren't interconnected? Not to the extent that some renewable energy all the way in Texas is going to get to Maryland. Let me go back to my fiction. You talk about signing up customers door to door. That can't possibly be true, because these energy companies have areas of service. But my point is this. This whole thing is to create a feel-good thing, because energy cannot be separated out. It's all in the grid. It's mixed in, however it was generated. But what you're doing is you're allowing companies to advertise that they provide green energy if they meet certain requirements. And essentially the consumers, while they don't really know this, all they know is this company, at least 51% of its energy meets that requirement. And it's put in the grid, and they can advertise it that way. That's the way it works, right? Yes, Your Honor, that is the way it works. I will push back just briefly on door to door sales. That is what was happening here. Well, how can that be, because the power lines, as I understand it, you've got a service area, say Duke Power, for example, here, or whatever it is, Dominion here. They have power lines everywhere. And some other little company is not going to be able to step in and say, this is my power. So, Your Honor. Go ahead. Thank you, Your Honor. The best explanation of this is the district court's opinion, which cites to an opinion that explains in Maryland in 1999, I believe, Maryland basically opened up its energy grid to allow individual residents to purchase their energy from third-party energy providers. They would still use the distribution network, which you're discussing here, of Dominion or BGE like we have near Baltimore, but the actual purchasing of the energy itself would be through this other entity. It's free choice there. Yes, Your Honor. That is how it was framed. Say that again. It was a free choice. I believe the bill that went through the General Assembly at the turn of the century was some sort of free choice act that opened up the state's energy market. And this permitted sales to third-party entities outside of your normal utilities. I understand what you're trying to do in terms of, if a company provides at least 51% of their energy as clean, green, then they can advertise that way. I get that. But what I don't get is this door-to-door thing. So one thing that may be helpful, Your Honor, we identified several pieces of testimony that went before the General Assembly, including advocates for this bill and consumer protection advocates, the People's Council, which in Maryland advocates for Maryland consumers. They all recognized that there was a certain amount of dysfunction in this space, in that individual residents were having their doors knocked on, that there were some actors within the space that were focusing on low-income neighborhoods. There were even stories of people being signed up for this without their knowledge, individuals basically on their deathbed being signed up for it, and then their families finding out later that they've been signed up for this. So is it this simple? Say we've got a street, and you've got four power companies, three power companies, X, Y, and Z. So X goes to one house, and people sign up for X energy. Y goes to the next house, they sign up, and that's who they pay their bill to. Is that the way it works? So everything would still come through your normal utility, but you would be paying these additional monthly payments as an eco-buyer, or maybe you've just been sort of confused and just gone with it. But, yes, you'd be paying these third-party, these retail energy suppliers that are third-party, instead of your standard utility. But aren't there plenty of consumer protection statutes that are supposed to deal with those issues? There are consumer protection statutes, Your Honor. However, this, I think, is a very specific. And how does this statute stop those examples that you just described? I think it stops those examples in sort of the two ways in which I discussed before. So Maryland believes this is an inherently misleading attempt to get individuals to purchase green energy that is, frankly, not green, but by having this definition so that residents and consumers can make informed decisions about the energy that they're going to purchase and the disclosures that are going to tell them. So are providers no longer doing these door-to-door activities? So I think it's important to note, as we did in the brief, that this is a facial challenge, and this isn't about individual as applied. But it's my understanding that, due to SB 1, that none of these third-party energy suppliers that make these alleged green offers are operating in Maryland currently as a result. Now, one thing that they raise is that they can't even use, based on this law, green in their name. Is that true? No, Your Honor, it's not. And I think that, in numerous places, appellants attempt to sort of say that this is about their core political speech related to green as an idea or climate change, et cetera. The district court, I think, rightfully saw through that and said that, you know, that's not what's going on here. This is specifically targeted to commercial speech. And as an example that they give in their brief, they have this 2024 voting guide. When you go onto that website, as you scroll down, at a certain point, you get a pop-up that is unable to be moved from unless you X out of it. And it says some version of, you know, sign up for our sensational offerings. So this is all window dressing to commercial speech and all window dressing to advertisements to try to get individuals signed up to purchase this energy, Your Honor. Do you have anything else? Just in conclusion, Your Honors, this is a facial challenge. This is an extraordinary remedy that's being sought here. And the district court was correct in denying that motion. Thank you. Thank you very much. Thanks. So a few points on rebuttal, Your Honor. I mean, I've heard from the bench today, and I think it's something that we would not dispute. There are substantial state interests that the state has here that it could adopt permissible means to advance. And those interests could include consumer deception, health and welfare of their citizens. We're not disputing that, Your Honor. But if you look at Central Hudson itself, which set up this framework for commercial speech, you can't restrict speech unless the means in which you do it directly advances those interests and is appropriately tailored. So Central Hudson itself, Judge Diaz, this deals with utilities, heavily regulated industry. There was an argument that the utilities promotional materials were outside the scope of the First Amendment. The court said no. The state advanced a conservation interest. Similar here, not the same exact thing, but it said we don't want promotion about accurate utility prices because we're worried that's going to lead to people using too much energy, off-peak usage and the like. We've got an interest in conservation. The Supreme Court said that sweeps too broadly. You are sweeping in a lot of lawful speech. And then on tailoring, the court said that the state had erred in not considering more tailored options, such are, for example, requiring the advertisements include information about the relative efficiency and expense of the offered service. That's exactly what you've suggested a couple of times here, Chief Judge Diaz, that, you know, they could have, if they really cared about regionalism, if they had an interest in the PJM, they could have tailored factual disclosures, which they already have with respect to their renewable portfolio standard, rather than cut off all debate about what it means to be green energy. It's the same situation here. And, Judge Floyd, I'd like to address, I mean, a couple of times you've talked about what is this all about, right? It's about the consumers feeling good, for example. It's also about subsidizing green power, right? I mean, what these recs have done is created this secondary market where consumers are pairing each kilowatt hour of regular energy with a kilowatt hour of clean energy. So that is subsidizing the wind farms. It's subsidizing the solar farms. And the reason that that matters, Your Honors, is because an eco-conscious consumer could say, I don't care where these farms are located. I'm just kind of interested in the environmental attributes of this power. In fact, in some other states, it's favorable jurisdictions where it's cheaper to build these farms, and so it's got more of an impact on the atmosphere than in some of the states in this area. And the way that the state has drawn this line, if you have 51 percent recs within the state, within the PJM region, excuse me, and 49 percent coal power, you can still call that green. But if you have 100 percent wind and solar from outside of the PJM region, right, you would have to comply with the RJM standards. Let's say 35 percent local, 65 percent outside, and it's all wind and solar backed, you can't call that green. So again, it's a fit problem. There might have been more narrowly tailored ways for them to do this, but this was not one of them. I want you to address your separability argument to a certain extent, because what if we did find that it went too far in terms of the marketing piece, but what about the disclosure piece? Can they vote still? Why couldn't that proceed? I think the problem here, Your Honor, is that everything is keyed off the definition of green power. And so in order to participate in the green power market, I mean, this is how they wrote the statute. They wrote the statute in an impermissible way. To market green power, you need to comply with the speech prohibitions we've been talking about. You need to comply with the disclosure requirement, which uses some of the same terms like renewable that are part of the green power definition. And you need to get your price approved. So to cut out one or more of these really, to my mind, would require this court engaging in a rewriting of the statute where it wouldn't all hang together. And then participation in the regular power market is defined as power other than green power. So that is why if you look at the state's brief, Your Honor, they are not contesting that this dual market structure is all integrated. They're arguing that there are other things such as the ban on variable rate contracts, the licensing requirements that are outside the purview of this dual rate structure. So, Your Honor, I will say, you know, I mean, our position is the whole statute should be enjoined, but I think, you know, at minimum, these dual market provisions all hang together in the manner that I was describing. If the green related to Judge Giles' question, if the green energy provisions did not exist and this was simply an issue of disclosures, would you be here today? Well, I think as I said before, Your Honor, if it's purely factual disclosures and particularly what you are saying, which is that, you know, we had to disclose, are our recs sourced in PJM? Are they not sourced in PJM? Then, no, we would not be standing here, Your Honor. All right. Thank you very much. Thank you. My thanks, our thanks to both counsel for their excellent arguments this morning. We'll ask you to come up and greet us and adjourn court for the day.
judges: Albert Diaz, Henry F. Floyd, Patricia Tolliver Giles